FISHER, Circuit Judge,
dissenting:
I respectfully dissent. In my view, under Garcia-Quintero v. Gonzales, 455 F.3d 1006 (9th Cir.2006), Guevara was “admitted in any status” for purposes of 8 U.S.C. § 1229b(a)(2) when the government exercised its discretion to grant his application for employment authorization. The Immigration Judge (IJ) correctly applied Garcia-Quintero in concluding that Guevara is eligible for cancellation of removal. I would grant the petition for review and remand for entry of an order cancelling removal, consistent with the IJ’s decision.
I.
Section 1229b(a) allows the Attorney General to cancel removal for aliens who (1) have accrued five years in legal permanent resident (LPR) status, (2) have “resided in the United States continuously for seven years after having been admitted in any status,” and (3) have not been convicted of any aggravated felony. At issue here is whether and when Guevara was “admitted in any status” for purposes of § 1229b(a)(2). I would hold he received such an admission when he was granted an employment authorization benefit that is functionally very similar to the Family Unity Program (FUP) acceptance held to constitute § 1229b(a)(2) admission in Garcia-Quintero, 455 F.3d at 1018-19.
I recognize that applicable regulations provide some basis for distinguishing FUP beneficiaries from applicants for adjustment of status under Immigration and Nationality Act § 245(i), 8 U.S.C. § 1255(i), like Guevara. Whereas 8 C.F.R. § 274a.l2(a) makes FUP participants automatically eligible for work authorization “incident to status,” subsection (c) of that *1096 regulation requires applicants for adjustment of status to apply for employment authorization. But the majority’s reliance on this distinction misses the point. See Maj. Op. at 1091-93. The issue is not whether Guevara received employment authorization as a result of some existing status. This case instead presents the converse question: whether status was conferred on Guevara as a result of the discretionary grant of employment authorization.
I would hold that it was. Once employment authorization is granted under § 274a.l2(c), it is largely equivalent to the § 274a.l2(a) authorization to which FUP participants are entitled: it allows the holder to live and work in the United States openly and lawfully while his application for adjustment of status is processed. Thus, although the employment authorization Guevara received is formally distinguishable from the employment authorization available to FUP beneficiaries, Guevara’s authorization was substantially comparable to the FUP benefit. Both the benefit Guevara received and the similar benefit available through the FUP implicitly authorize temporary residency pending final resolution of the beneficiary’s application to adjust status.
The majority distinguishes FUP beneficiaries from other § 245(i) applicants by pointing to the relatively stringent FUP entrance criteria. See Maj. Op. at 1092-93. But the majority does not explain how these heightened requirements for FUP acceptance differentiate those ultimately allowed into the program from applicants who are granted similar benefits. Differences in program entrance criteria are of little import after the agency has exercised its discretion to grant the applicant benefits. It may be that those who are able to satisfy FUP entrance criteria enjoy a more privileged status than that of § 245(i) applicants granted work authorization, by virtue of having passed through a more stringent selection process and having received greater benefits. “Any” status is acceptable for purposes of § 1229b(a)(2), however. Cf. United States v. Ochoa-Colchado, 521 F.3d 1292, 1298 (10th Cir.2008) (acknowledging that even if employment authorization does not make an alien’s presence legal, “[a]n alien who has filed for adjustment of status and received an [employment authorization document] may in some sense be ‘authorized’ to be in the United States, inasmuch as he is granted a temporary reprieve from removal proceedings and permitted to work here pending the outcome of his case”).
I also recognize that FUP regulations allowing travel abroad are more permissive than those governing advance parole of § 245(i) applicants like Guevara, as was pointed out in Vasquez de Alcantar v. Holder, 645 F.3d 1097, filed concurrently with this opinion. See Vasquez de Alcantar, 645 F.3d at 1105-06.[1] Unlike a non-FUP applicant, a FUP program participant may travel outside the United States and will upon return be “admitted in the same immigration status as the alien had at the time of departure.” 8 C.F.R. § 236.16. Non-FUP applicants, by contrast, must apply for advance parole before they may travel abroad, and the grant of advance parole does not itself constitute an admission. See 8 U.S.C. § 1182(d)(5)(A). The very existence of an advance parole application process implies that applicants like Guevara have a legal benefit they stand to lose, however. In Guevara’s case, that benefit was significant: if he left the United States without permission, he *1097 risked being stripped of the employment authorization the agency affirmatively exercised its discretion to grant. Of course, given their more generous travel privileges, FUP beneficiaries may enjoy a more privileged status than that of non-FUP employment authorization holders like Guevara. However, that difference is irrelevant for purposes of § 1229b(a)(2), which does not distinguish among different sorts of status.
I am likewise unpersuaded that a grant of employment authorization cannot constitute admission in any status under Yepez-Razo v. Gonzales, 445 F.3d 1216, 1219 (9th Cir.2006), also cited in Vasquez de Abantar. See Vasquez de Abantar, 645 F.3d at 1104-05. Yepez-Razo recognized that after a FUP beneficiary is accepted into the program, the time the beneficiary spends in the program does not count as unlawful presence under 8 U.S.C. § 1182(h). See Yepez-Razo, 445 F.3d at 1218-20. As I explain farther below, however, those who receive discretionary employment authorization benefits are also legitimately present, notwithstanding the lack of similar statutory language explicitly recognizing their lawful status.
In sum, the majority offers no convincing reason to distinguish this case from Garciar-Quintero. I would follow Garciar-Quintero by holding that the discretionary grant of an employment authorization constitutes § 1229b(a)(2) admission.
II.
The majority’s contrary conclusion- — -that undocumented § 245(i) applicants are not admitted in any status until their § 245(i) applications are approved — means that relatively minor differences in the circumstances of the applicant’s entry into the United States dramatically alter the application of § 1229b(a)(2).
In Matter of Blancas-Lara, the BIA held that nonimmigrants whose presence in the United States was once legal, no matter how briefly, have been “admitted in any status.” See Matter of Blancas-Lara, 23 I. & N. Dec. 458, 459-61 (B.I.A.2002). Blancas-Lara concluded that a nonimmigrant who entered with a border crossing card allowing him to stay in the United States for 72 hours was admitted in any status at the time of his lawful entry, and that subsequent years during which the nonimmigrant remained in the United States illegally could be counted toward § 1229b(a)(2)’s seven-year requirement. See Blancas-Lara, 23 I. & N. Dec. at 459. It would be illogical to allow nonimmigrants who overstay their visas to accrue time toward the seven-year requirement during their unlawful presence whereas undocumented aliens who have been granted permission to work in the United States during the pendency of their § 245(i) applications cannot do the same. From a commonsense standpoint, the presence of a § 245(1) applicant who has been permitted to work in the United States is more legitimate than the unlawful presence of a nonimmigrant whose temporary visa has expired. But the majority’s reasoning permits just such a result.
III.
I recognize that the BIA disagreed with the reasoning of Garcia-Quintero in Matter of Reza-Murillo, 25 I. & N. Dec. 296 (B.I.A.2010), although I leave for another day the reconciliation of Garcia-Quintero and Reza-Murillo under National Cable & Telecommunications Association v. Brand X Internet Services, 545 U.S. 967, 982-83, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), which the government does not invoke. I do note, however, that I do not find persuasive Rezar-Murillo’s insistence that “declining to treat a grant of FUP benefits as an ‘admission’ ... does not create absurd or bizarre results.” Reza-Murillo, *1098 25 I. & N. Dec. at 299. Reza-Murillo does produce absurdities, by divorcing the accumulation of time toward the seven-year requirement from the apparent statutory goal of requiring accrual of legitimate presence. See Cuevas-Gaspar v. Gonzales, 430 F.3d 1013, 1027-28 (9th Cir. 2005) (concluding that the § 1229b(a)(2) requirement “was designed to [allow for] counting a limited period of time spent in non-permanent status”). As explained above, Reza-Murillo and Blancas-Lara allow aliens who entered legally but soon after lapsed into illegal status to qualify for cancellation of removal, while denying cancellation relief to aliens like Guevara whose presence has long been recognized and accepted by the Attorney General.
In sum, I would hold that, consistent with Blancas-Lara and Garcia-Quintero, Guevara was “admitted in any status” when the United States exercised its discretion to grant his application for employment authorization. Because he received such admission more than seven years before receiving a notice to appear, he was eligible for cancellation of removal, which the IJ exercised his discretion to grant. I would grant the petition for review and remand for reinstatement of the IJ’s decision.

. As I noted in my concurrence in Vasquez de Alcantar, I do not read that opinion to address the issue in this case, so it does not foreclose the conclusion I urge here. See Vasquez de Alcantar, 645 F.3d at 1106 (Fisher, J., concurring).